[Civ. No. 7433. Fifth Dist. June 7, 1984.]

WILLIAM HENRY POWERS, JR., Plaintiff and Appellant, v.
COMMISSION ON PROFESSIONAL COMPETENCE,
Defendant and Respondent.
BAKERSFIELD CITY SCHOOL DISTRICT,
Real Party in Interest and Appellant.

COUNSEL

Brenda McKinsey for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Frank J. Fekete, Peter C. Carton, Joanne A. Velman, Roger Wilner and Don G. Royal for Real Party in Interest and Appellant.

OPINION

**ZENOVICH, Acting P. J.**—The instant case involves the efforts of the Bakersfield City School District (District) to dismiss a tenured permanent

teacher, William Henry Powers, Jr. (teacher). Both parties concede if District is successful in its appeal the cause will have to be remanded to the superior court for decision on the merits. For reasons hereinafter stated, we conclude the trial court erred in its ruling on the jurisdictional issues before us and remand the case for further proceedings. For guidance on remand, we conclude: (1) It was not necessary for the commission to make a specific finding of "unfitness to teach" when dismissing the teacher for unprofessional conduct related to classroom activities; (2) the District's action in transferring teacher out of the classroom pending his hearing did not invalidate the dismissal action; (3) District's failure to serve its original petition was not grounds for dismissal of its petition; (4) the commission did not fail to make sufficient findings on the issue of limiting teacher's constitutional rights; and (5) the commission at the time it acted did not have the power to stay the dismissal.

## THE CASE

Pursuant to Government Code section 11503, on January 6, 1977, charges for dismissal were served upon teacher, alleging violations of Education Code section 44932, subdivisions (a), (d), (e) and (g), and section 44933.[1] An amended accusation was filed on March 1, 1977. Thereafter, teacher filed with District a notice of defense and request for hearing pursuant to Government Code section 11506.

By letter dated January 24, 1977, counsel for District advised teacher that the date of March 7, 1977, had been set with the Office of Administrative Hearings (OAH) after a previous date of February 1, 1977, which had been agreed to by the parties, was subsequently rejected by counsel for teacher. This letter stated that March 7 had been set for the hearing to commence and that the calendar clerk for the OAH had also confirmed the dates of June 13-17, 1977, for the hearing. By letters dated February 24 and 25, 1977, respectively, teacher and District designated their appointees to the commission.

On March 7, 1977, in compliance with then section 13413 (now § 44944), within 60 days of teacher's request for a hearing, the Commission on Professional Competence began hearing the matter. After the appearances of counsel were taken, District called its first witness, Dorothy Kachigian. Mrs. Kachigian was asked six foundational questions. At this point, the administrative law judge interrupted and explained to the parties that the normal procedure of the OAH was to convene hearings within 60 days of teachers' demands for hearings, but only for the purpose of swearing in a

---

[1]Unless otherwise indicated, all statutory references are to the Education Code.

witness and entertaining a request for continuance. No party would request a continuance. Teacher objected to a continuance on the ground that delay would severely prejudice him, since students and teachers who could testify in his behalf would leave for the summer holiday and the hearing could not finish in time for teacher to either resume teaching for the District in the fall or get another teaching job. Counsel for District did not so clearly object to a continuance, but stated, "the district is here and prepared to proceed on the merits, and a continuance was not requested by the district."

The administrative law judge, who was also the chairman of the commission, ordered a continuance on his own motion. The chairman also told the parties that the week of June 13, 1977, had been reserved to complete the hearing.

The hearing reconvened on June 13, 1977. At the March 7 session, District's appointee had been Edward Dow. During the intervening period, Dow wrote to the administrative law judge that he had heard statements from students of his who were former students of Mr. Powers and which "may have prejudiced me towards Mr. Powers." He was unsure that he could be unbiased. "The students have had mostly praise for Mr. Powers. I know there must be much more to this case, and I would hate for these two students, being in my room, to possibly cause some unforeseen problems, or in any way influence my decision." The administrative law judge advised Dow to resign and asked the District to appoint another member.

At the hearing reconvened on June 13, the District's appointed panel member was Gene Snyder. Mr. Snyder had not been present at the March 7 hearing. Teacher made a timely objection to the change in membership of the commission and his objection was overruled.

The District presented its case during the entire week of June 13, 1977, and during five additional days of hearing interrupted by further continuances primarily caused by OAH's calendar congestion. At the end of November 1977, the District completed its case-in-chief.

Teacher presented his case over the next eight months at interrupted hearings. The hearings ended in April 1978, over a year after they began. On July 12, 1978, the commission issued its decision.

A brief summary of the factual findings indicates that teacher was first employed by the District in 1967. Except for a brief stint teaching fifth grade, teacher taught in a sixth-grade classroom. Most of the charges against teacher involved teacher's creative writing program. In short, it was alleged that pupils were encouraged to write on any subject they chose

without restriction. Frequently, the pupils' stories tended to focus on several class members and contained derogatory, insulting and abusive remarks about fellow pupils. Often the stories were read out loud in class, but offensive words were "bleeped" out. The students could withdraw from the writing activity by having his or her name placed on the blackboard. In 1973, school administrators had conferences with teacher concerning his writing program. In 1976, it was discovered that teacher was teaching creative writing in a manner which resulted in stories from the sixth graders which were similar in nature to those produced by the students in 1973. Teacher defended his program and indicated he did not wish to stifle his pupils' creativity by limiting them to more traditional writing assignments. He stated that he had tried to discourage stories containing questionable content. He denied any intent to encourage his pupils to write offensive stories.

The commission noted that teacher had been active in union affairs for a number of years and had been an officer of his local teachers' union. He had edited a newspaper and written articles and editorials critical of the District and some of its policies. During a recent Department of Health, Education and Welfare (HEW) investigation of the District, teacher assisted HEW attorneys by giving them information about possible violations by the District concerning use of bilingual aides.[2] Nonetheless, the commission found that the reasons for filing the dismissal charges against teacher were the causes stated in the statement of charges and "not official dissatisfaction with his exercise of his constitutional rights."

The commission ruled that teacher's persistence in continuing his creative writing program showed a remarkable lack of judgment, especially "in view of the directions given him at the conferences in January, 1973." The commission also noted that it was "noteworthy" that the District administrators, although concerned about teacher's creative writing program since January 1973, "never had any formal classroom observation of this part of Mr. Powers' teaching." As to the charges relating to teacher's creative writing program, the commission ruled that although these charges did not support immoral conduct, incompetency, or evident unfitness for service, the charges nonetheless supported dismissal because the conduct constituted unprofessional conduct and insubordination.

In addition, the commission ruled that separate cause for dismissal was established by the findings in paragraphs XIV (leaving his duty assignment on the playground without permission), XV (failing to attend a required in-

---

[2]It was alleged the District used federal bilingual aid funds to employ monolingual teachers.

service training) and XVI (leaving class unattended to assist a friend who had borrowed his car). The commission ruled that these acts constituted unprofessional conduct and insubordination.

The commission also ruled that there was no cause for dismissal established by virtue of the findings in paragraphs XII (relations with a female employee of the District), XIII (leaving his classroom briefly to go to the bathroom) and XVII (failing to seek permission for a classroom lunch).

The commission also made special findings as follows: "Respondent appears to have a sincere interest in his pupils' education and welfare. His failure to perceive the harmful effects of his creative writing program is remarkable. His persistence in pursuing his program despite the repeated warnings amounts to insubordinate conduct.

"Mr. Powers was a popular teacher with his pupils and liked by many parents, although it should be noted that parents were not aware of the substance of his creative writing materials until after initiation of the charges against him. He was an effective teacher with some pupils. His evaluations by principals were almost without exception above average or outstanding."

The commission ruled that teacher should be dismissed from his employment as a permanent certificated employee of the District, but ruled that the order of dismissal should be permanently stayed, subject to conditions. The first was that teacher be suspended and placed upon compulsory leave of absence for the 1978-1979 school year without pay and without accrual of any employment benefits to him during the period of suspension and compulsory leave of absence. Second, teacher would not be able to recover from the governing board of the District any attorney fees incurred by him in connection with the instant proceeding.

Gene Snyder, the commission member appointed by District, dissented from the order staying the dismissal and granting a one-year suspension.

Since teacher and District were not satisfied with the result of the commission's decision, three actions were filed, two in Kern County Superior Court and one in West Kern Municipal Court, which was ultimately consolidated with the others in the superior court.

In the first action, teacher sought a writ of mandate reversing the commission's order in its entirety. The petition alleged errors of law concerning the commission's jurisdiction and procedures and the District's right to seek dismissal. The petition also challenged the evidentiary basis for the findings and conclusions which led to the dismissal.

In the second action, District contended that the commission's decision to suspend the imposition of dismissal was in error for two reasons: First, this result was not consistent with the commission's findings of fact, and second, such an order was beyond the commission's jurisdiction. In the same action, District also sought an order compelling the Controller of the State of California to allocate the costs of the hearing between the various parties in a manner consistent with the provisions of section 44944, applicable when a teacher is dismissed. Although filed, the petition was never served. However, an amended petition was filed and served on January 16, 1979. A second amended petition was filed and served on September 25, 1979.

During the school year 1978-1979, teacher served his suspension without pay ordered by the commission. In August 1979, less than a month before the new school year in which the commission had ordered teacher returned to teaching, District moved the superior court to stay that part of the commission's decision, pending the decision of the court on the mandate actions. Teacher objected to the stay and promised never again to teach "unrestricted creative writing." However, the superior court granted the motion.

The trial court heard the mandate action and, on June 29, 1981, issued a memorandum of its intended decision. Among other things, the court ruled the commission did not have jurisdiction to stay the dismissal. Both parties moved for reconsideration of aspects of the intended decision and the court ruled on that motion, granting certain modifications, on November 3, 1981. The court deleted any reference to the power of the commission staying the dismissal. The court decided: (1) The commission lacked jurisdiction to continue the administrative dismissal hearing to commence beyond the 60-day period required by section 44944; (2) the chairman lacked authority to permit a change in membership of the commission once the hearing had begun; and (3) the commission failed to make sufficient findings on the issue of limiting the teacher's constitutional right pursuant to *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575 [100 Cal.Rptr. 16, 493 P.2d 480]. District objected to findings of fact and conclusions of law prepared by teacher. The court signed the findings and conclusions on April 6, 1982. In the findings the court deleted any reference to the *Bekiaris* issue described above. The court entered judgment, granting teacher's petition for writ of mandate and denying District's petition for writ of mandate on June 17, 1982. The court issued a writ of mandate ordering District to immediately reinstate teacher to teaching, pay a salary for all the years he was not paid, and pay reasonable attorney fees and costs. The court ordered the commission to dismiss all charges against teacher.

The findings and conclusions demonstrate that the judgment was rendered strictly on jurisdictional grounds and not on the merits.

DISCUSSION

I

■ We first examine whether teacher was denied a speedy hearing when the commission chairman ordered a continuance on March 7, 1977.

The trial court ruled that the hearing held by the commission on March 7, 1977, was conducted only for the purpose of continuing the hearing beyond the statutory limit of 60 days and did not constitute "commencement of the hearing" pursuant to section 44944, subdivision (a). The trial court also ruled that the continuance of the March 7 hearing was not a continuance for good cause pursuant to Government Code section 11524 and "the continuance denied petitioner his right to a speedy hearing."

In its original memorandum of intended decision, the court relied on *Hartman v. Santamarina* (1981) 118 Cal.App.3d 87 [173 Cal.Rptr. 236]. In this case, 25 days before the expiration of the 5-year period for bringing a malpractice action to trial, plaintiff's attorney announced he was presently engaged in a trial and would be unable to proceed. Later that day, prospective jurors were sworn, seated and the oaths administered. Immediately thereafter, plaintiff moved for a continuance, which was granted, and the trial court discharged the jury. After expiration of the five-year period, defendant's motion to dismiss the action was heard and granted. The Court of Appeal affirmed. The court held that the proceedings in which the jury was seated and then dismissed did not constitute "trial" of the action within the meaning of Code of Civil Procedure section 583, subdivision (b).

The District contended in its points and authorities in support of its motion to reconsider that *Hartman v. Santamarina* was not applicable to the instant mandate actions. Teacher pointed out in his memorandum of points and authorities in support of his motion to reconsider that the case of *Hartman v. Santamarina* could not be cited as authority for, indeed, the Supreme Court had granted hearing in the case. However, teacher argued that his position could be supported by analogy to the five-year civil trial cases such as in *Hartman*.

The Supreme Court later reversed the lower court opinion in *Hartman*. (See *Hartman v. Santamarina* (1982) 30 Cal.3d 762, 765 [180 Cal.Rptr. 337, 639 P.2d 979]; see also *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 390 [196 Cal.Rptr. 117]; *Central Mutual Ins. Co. v. Executive Motor Home Sales, Inc.* (1983) 143 Cal.App.3d 791, 795 [192 Cal.Rptr. 169].) Relying on *Miller & Lux, Inc. v. Superior Court* (1923) · 192 Cal. 333, 342 [219 P. 1066], and a long line of cases following this

decision, the court in *Hartman* held that the procedure complained of had been an accepted practice by the bench and bar for almost a half century. The court distinguished *Adams* v. *Superior Court* (1959) 52 Cal.2d 867, 870 [345 P.2d 466]. In *Adams,* a witness was sworn and testified, but the sole purpose of putting him on was to obtain evidence relevant to a motion for a continuance, which was granted. The court in *Hartman* held that "Adams did no violence to *Miller & Lux* in holding the testimony elicited for the sole purpose of *not* going to trial did not amount to bringing the case to trial." (*Hartman, supra,* 30 Cal.3d 762, 766.) The defendant in *Hartman* had suggested that the procedure of impaneling the jury just to send it home five minutes later was a "charade" which did little credit to the public image of the courts. The court in *Hartman* replied: "To this there are two answers, one short, one a bit longer. The short one is that the defendant need not insist that the charade be played out: he can, saving all his objections, stipulate that the necessary ceremonial has been observed. The long answer is that from time immemorial charades and fictions have played a vital role in helping courts over, around and under legal roadblocks which they were not quite ready to assault head-on." (*Ibid.*)

Before us, District relies on the Supreme Court opinion in *Hartman* v. *Santamarina, supra.* Teacher now contends that reliance upon *Hartman* is clearly misplaced. Teacher points out that "there is no evidence in the record to suggest that anyone other than the Office of Administrative Hearings has ever relied upon the efficacy of OAH's 'normal procedure' of swearing a witness in within the statutory deadline for a teacher dismissal hearing, and then entertaining a continuance request." Teacher points out in the instant case neither party requested a continuance.

We find no reason why *Hartman* v. *Santamarina, supra,* 30 Cal.3d 762 cannot be applied by analogy to the facts of the instant case. It is clear from a careful reading of the instant record that the administrative law judge had frequently utilized the procedure of commencing a hearing within statutory time limits merely for the purpose of taking testimony and then continuing the hearings to a time when the OAH could schedule the needed time in which to complete the hearings. Apparently, there is the same problem of calendar congestion in the administrative law field as there is in the court system. It has been held that where a plaintiff has obtained a trial date and is prevented from going to trial because no courtroom is open, the delay for court congestion is not counted in calculating the five-year period for dismissal. (*Breacher* v. *Breacher* (1983) 141 Cal.App.3d 89, 91 [190 Cal.Rptr. 112]; *Bennett* v. *Bennett Cement Contractors, Inc.* (1981) 125 Cal.App.3d 673, 677-678 [178 Cal.Rptr. 633]; *Goers* v. *Superior Court* (1976) 57 Cal.App.3d 72, 74-75 [129 Cal.Rptr. 129]; see also *Hartman* v. *Santamarina, supra,* 30 Cal.3d 762, 766.)

Teacher next contends the trial court erred in concluding that the continuance granted by the chairman of the commission was not a continuance for good cause pursuant to Government Code section 11524. This code section provides that continuances may be granted by the administrative law judge for good cause. The administrative law judge in the instant case continued the hearing on his own motion. Citing no authority, teacher appears to contend that an administrative law judge does not have authority to continue a hearing on his own motion.

*Young* v. *Governing Board* (1974) 40 Cal.App.3d 769 [115 Cal.Rptr. 456][3] provides authority that a hearing officer has the power to order continuances on his own motion and that a hearing officer's congested calendar constitutes good cause for such a continuance. *Young* involved the dismissal of a probationary teacher. Rather than the 60-day rule of section 44944, the hearing was subject to the requirement that a final notice of dismissal be given not later than May 15. However, that date is extended by the length of any continuance granted pursuant to Government Code section 11524. The hearing officer in *Young* determined that because of the time requested for the hearing and "due to commitments of the Hearing Officer and counsel" the case would be continued "for good cause." (*Young, supra,* 40 Cal.App.3d at p. 773.) The teacher complained that her own request for a continuance had been denied. The Court of Appeal determined that the continuance was granted "apparently on the hearing officer's own motion." (*Id.,* at p. 774.) Nonetheless, the continuance, which extended the jurisdictional time within which to give final notice of dismissal, was upheld.

Teacher asserts that *Young* does not apply here because the parties there had consented to a continuance, unlike the instant case. However, the teacher's own request for a continuance was denied in *Young* and the continuance eventually given was done on the court's own motion due, in part, to calendar congestion, just as in the case at bar.

As in *Young,* there appears to be good cause for the continuance granted in the instant case. No further hearing dates would be available during the week of March 7 and the most that could be accomplished on March 7 was the taking of a few hours of testimony. On the other hand, at the time it appeared that the entire case could be heard and concluded during the week of June 13. The administrative "pleadings" in the instant case were noted on the record by the administrative law judge on June 13, 1977. The pleadings include a letter dated January 24, 1977, from counsel for the District

---

[3]Overruled on other grounds in *Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 827 [129 Cal.Rptr. 443, 548 P.2d 1115].

to counsel for teacher, giving notice that the hearing would commence on March 7 and continue to June 13-17, 1977, and discussing the problem of scheduling dates with the OAH. The record reveals no objection to the schedule described in this letter until six weeks later at the hearing. Teacher's counsel acknowledged his understanding of this schedule at the March 7 hearing. Despite this notice and acknowledgment, teacher's counsel expressed a desire to commence on March 7, 1977, and proceed until the case was concluded. Counsel for teacher added, *"But if we can't go tomorrow and so forth, I think it's up to the hearing officer to make a determination, as I oppose having some testimony today and some in 60 days."* (Italics added.) Thus, teacher expressed preference for not interrupting the evidentiary phase of the hearing by starting on March 7 and resuming again on June 13.

We find nothing in Government Code section 11524 which prevents a continuance on the hearing officer's own motion. The hearing officer as chairman of the commission rules on questions of law in much the same manner as a trial court judge. Trial judges have inherent power to continue pending litigation independent of statutory authorization. (See 1 Cal.Jur.3d, Actions, §§ 159-160; Cal. Administrative Agency Practice (Cont.Ed.Bar 1970) § 2.93, p. 127.) Moreover, in *Shoults* v. *Alderson* (1921) 55 Cal.App. 527, 531 [203 P. 809], it was held that the State Board of Medical Examiners had the inherent authority, derived from their general powers, to continue hearings. Thus, in our opinion, it is clear that administrative agencies enjoy the power to continue (and not merely grant requests to continue) their proceedings. And, as stated above, the practice of commencing a judicial or quasi-judicial proceeding within the statutorily required period by opening the record and calling one witness to be sworn is well established. (*Hartman* v. *Santamarina, supra,* 30 Cal.3d 762; *Miller & Lux, Inc.* v. *Superior Court, supra,* 192 Cal. 333, 342.)

The continuance granted on March 7, 1977, did not deny teacher his right to a speedy hearing. Indeed, the record reveals that the hearing could not, in fact, be completed on this date. It is evident that calendar congestion in the OAH, as well as the courts in general, requires some degree of patience by all parties concerned.

## II

■ We next examine whether the commission lacked jurisdiction to reconvene on June 13, 1977, with a new member.

The trial court ruled that the chairman of the commission had no authority to change the membership of the commission once hearings began and,

therefore, the commission was without jurisdiction to proceed with a new member on June 13, 1977. In its original memorandum of intended decision, the court stated, "Although it would seem reasonable that a Commission member can be replaced when forced to resign because of possible bias, *Graves* v. *Commission on Professional Competence* (1976) 63 Cal.App.3d 970 [134 Cal.Rptr. 71] holds that an administrative agency must act within the powers conferred upon it by law and may not validly act in excess of such powers. No statutory authority to replace a Commission member exists."

We believe the trial court's reliance on *Graves* v. *Commission on Professional Competence, supra,* 63 Cal.App.3d 970 is in error. In *Graves,* the chairman of the commission resigned from the OAH after the hearing but before the decision was reached. Nevertheless, despite the clear statutory command of section 44944 that the chairman be a hearing officer *"of* the state Office of Administrative Hearings" (italics added), he continued to chair the panel after he had left that office. Thus, the panel had no valid chairman at the time of its deliberations and its decision was invalid.

On the other hand, in the case at bar, all panel members met the statutory qualifications from the time of their appointment through the issuance of the decision and dissent. This is not a case where a panel member was replaced in the middle of a hearing after half the evidence had been presented. At the June 13 hearing, a new District appointee, Mr. Snyder, took Mr. Dow's place on the panel. After receipt of the pleadings into the record, the same witness, Dorothy Kachigian, who had been sworn in at the first hearing, was sworn in again. Ms. Kachigian had been asked a total of six questions on March 7, 1977, all concerning her employment and years of teaching. She was asked the same questions again and gave the same answers on June 13, 1977. Snyder as commission member heard directly and at first hand the same evidence Dow had heard. He did not merely read a transcript of the earlier session. He had the same opportunity to hear personally every question to and answer of every witness and observed each witness' demeanor as did the other commission members. From these facts we find it cannot reasonably be argued that the substitution for good cause of one panel member for another during a continuance period was in any way prejudicial to Powers or denied him any procedural or substantive rights.

Teacher is correct when asserting that there is nothing in the statute which *specifically gives* the commission chairman the authority to change a member. However, we believe that, under the circumstances of the instant case, the commission chairman had inherent authority to make such a change. If in the absence of a specific statutory provision to the contrary, an agency has implied power to continue the case from time to time, so should an

agency have implied power to replace a commission member when a commission member feels he cannot render an unbiased decision. (See Cal. Administrative Agency Practice, *op. cit. supra,* § 2.93, p. 127; *Shoults* v. *Alderson, supra,* 55 Cal.App. 527, 531.)

### III

For purposes of guidance on remand, we next examine whether (1) it was necessary for the commission to make a specific finding of unfitness to teach; and (2) whether the District's action in transferring teacher out of the classroom pending hearing invalidated the dismissal action.

### A. *Unfitness to Teach*

■ First, citing *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375], teacher contends that dismissing teachers for unprofessional conduct, evident unfitness for service or incompetence requires a finding of unfitness to teach, a clear nexus between the behavior complained of and the teacher's ability to do his duty. Teacher contends there is no such finding here and argues that since the commission ordered teacher return to teaching after a one-year suspension, the commission could not make a "finding" of unfitness to teach.

*Morrison* v. *State Board of Education, supra,* involved an attempt to revoke the teaching credentials of a teacher who had resigned when confronted with evidence of a private, consensual, noncriminal homosexual relationship which had taken place 19 months earlier. The relationship was unrelated to the school district, its personnel or its students and was, in fact, unknown for a long time after it had occurred. Teacher's life diplomas were revoked on the ground of immoral and unprofessional conduct and acts involving moral turpitude. The court held that a teacher's actions cannot constitute immoral or unprofessional conduct or conduct involving moral turpitude within the meaning of then section 13202 unless such conduct indicates his unfitness to teach, that is to say, unless such conduct indicates that his future classroom performance and overall impact on his students are unlikely to meet the board's standards. (*Morrison, supra,* 1 Cal.3d 214, 229.)

We remind teacher that the commission in the instant case specifically found that no findings established cause for dismissal for immoral conduct or evident unfitness for service. Rather, as discussed above, the commission found that certain charges constituted grounds for dismissal for unprofessional conduct and insubordination. The unprofessional conduct charged in the instant case related to teacher's acts and programs in the classroom,

unlike in *Morrison,* where the act of unprofessional conduct in no way related to the teacher's performance in the classroom. The real import of *Morrison* is that there must be some nexus between teacher's conduct and his job performance before the conduct can form the basis for dismissal. Teacher's reliance on *Morrison* is misplaced.

Likewise, teacher cannot rely on *Lindros* v. *Governing Bd. of the Torrance Unified School Dist.* (1973) 9 Cal.3d 524 [108 Cal.Rptr. 185, 510 P.2d 361] and *Oakland Unified Sch. Dist.* v. *Olicker* (1972) 25 Cal.App.3d 1098 [102 Cal.Rptr. 421]. Teacher cites these two cases for the proposition that it is not enough for a district to show teachers had done something technically prohibited by district policies, but rather, districts are required to show that teachers are unfit to teach. However, these two cases merely establish that the teachers who did not have advance notice that their teaching methods were prohibited could not be dismissed *under the precise facts presented in those cases.* As District contends, these cases may become pertinent to a review of the instant dismissal *on the merits.*

### B. *Transfer*

Teacher was transferred out of the classroom to a clerical position at the District office on December 27, 1976. Teacher contends this constituted an unlawful "dismissal" without a prior hearing. Teacher contends that as he was a permanent teacher he could be dismissed only for cause, which can be found only after a hearing (§§ 44932, 44943). ■ Teacher argues that since the District dismissed him without the prior hearing required by law, it could not prevail on its dismissal action even if that were otherwise proper. Teacher relies on *Lunderville* v. *Emery Unified Sch. Dist.* (1968) 262 Cal.App.2d 459 [68 Cal.Rptr. 768].

In *Lunderville,* a probationary teacher was given timely notice of non-reemployment the next year. She was also told to stay away from her classroom and students effective April 19, although she was paid her full salary through the end of the school year. In June, she visited the superintendent's office and orally demanded a hearing. The superintendent told her to come back to the office at 4 p.m., at which time he would have a written demand for a hearing ready for her signature. She never returned to sign the written demand. (*Id.,* at p. 462.)

In *Lunderville,* the court construed former statutes dealing with probationary teachers. A probationary employee could be fired effective at the end of the year by receiving notice by May 15. (Former § 13443.) A hearing before the governing board was available, but Lunderville, as discussed above, failed to request one. A probationary teacher could be fired during

the year only for cause and in the manner specified for permanent teachers. (Former § 13442.) The court was faced with deciding whether Lunderville was properly terminated under either statutory procedure. The court held that the prohibition against further contact with her class and against rendering all professional service under her contract was a dismissal and that it failed to comply with the procedure for terminating employees "during the school year." However, the court found the teacher was properly dismissed effective at the end of the year. She had failed to request a hearing. (*Lunderville, supra,* at p. 467.) Even though the court held that she was wrongfully discharged *during the school year,* the court held that the teacher had proven no damage because she had been paid her full salary for the remainder of the school year and for the full term of her contract. (*Id.,* at p. 466.)

District contends that, like *Lunderville,* teacher was paid while he was in his nonteaching assignment; thus, he was not prejudiced by any alleged failure to grant him a hearing before the transfer. Moreover, District contends that when an employee has been charged with incompetency, unprofessionalism, immoral conduct and insubordination, the District may take reasonable steps to protect its students from further exposure to him during the hearing process. Unlike the teacher in *Lunderville,* teacher sought and received a full evidentiary hearing which resulted in a finding that cause for his dismissal was established.

Likewise, teacher's reliance on *Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309 [142 Cal.Rptr. 439, 572 P.2d 53] is misplaced. There, the court concluded there was substantial evidence to support a superior court's determination that no emergency existed at the time of a public school teacher's involuntary transfer by the school district. However, in the *Pasadena* case, the commission and superior court found that the district had violated its *own procedures* and for *that reason* lacked cause to dismiss the teacher. (*Id.,* at p. 311.) She was notified of the transfer on September 10, contrary to the *district's policy* that teachers must receive notice of involuntary transfers by the previous May 15. (*Id.,* at p. 312.) In the instant case, on the other hand, teacher does not point to a specific school policy, if any, that was violated.

Teacher has not shown he was prejudiced by his involuntary transfer to the District office in the middle of the school year. He has shown no prejudice by the fact that he was not given a separate hearing regarding the involuntary transfer. He was fully paid during this time period. Moreover, teacher has not shown that he requested separate hearings on his involuntary transfer. Lastly, teacher has supplied no authority for his proposition that

District's action in transferring him out of the classroom pending his hearing somehow acted to invalidate the dismissal action.

## IV

■ We next examine (1) whether the District's failure to serve its original petition is grounds for dismissal of its petition; (2) whether the commission failed to make sufficient findings on the issue of limiting teacher's constitutional rights pursuant to *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575; and (3) whether the commission had jurisdiction to stay the dismissal.

### A. *Code of Civil Procedure section 1107*

At the time relevant to this appeal, Code of Civil Procedure section 1107 provided in pertinent part as follows: "When an application is filed for the issuance of any prerogative writ, the application *shall* be accompanied by proof of service of a copy thereof upon the respondent and the real party in interest named in such application. . . . [¶] The court in which the application is filed, in its discretion and for good cause, may grant the application ex parte, without notice or service of the application as herein provided."

The District in the instant case never served a copy of its original petition for writ of mandate. A first and second amended petition, however, were served.

Teacher demurred to District's petition for writ of mandate, in part, because District failed to serve the petition prior to filing or failed to obtain an excuse for failure to do so from the court. The trial court rejected this contention, ruling that no prejudice was shown, and apparently because there is a local practice in Bakersfield of not requiring service before filing.

Teacher contends that the word "shall" in Code of Civil Procedure section 1107 must be interpreted as "mandatory" in order to give the statute any meaning.

As stated above, Code of Civil Procedure section 1107 states that the court may permit exceptions to the rule requiring proof of service "in its discretion and for good cause." It has been stated that "Local practices vary greatly regarding the degree of formality required." (Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 9.41, p. 160.) For example, in Los Angeles County, the general rule is that the petitioner must make personal service of the petition before he files it and the procedures are interpreted in a formal manner. (*Id.,* at pp. 160-161.) On the other hand, in San Fran-

cisco, the usual procedure is to file the petition first, operating what is, in effect, a blanket exception. (*Id.*, at p. 161.) Indeed, it has been stated that "In practice, the discretion given by CCP section 1107, to permit exceptions to the rule that service must precede filing of petition, is interpreted quite broadly." (*Ibid.*)

It has also been stated that "The requirements as to service when the petition is filed, in section 1107 of the Code of Civil Procedure, would seem to be more discretionary than mandatory as the court may act on a petition without any service if it decides to do so." (*Peter* v. *Board of Supervisors* (1947) 78 Cal.App.2d 515, 521 [178 P.2d 73].) Furthermore, California Rules of Court, rule 56(b), provides that the court in its discretion may allow the filing of a petition without service. (See also *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922 [156 Cal.Rptr. 152].) We therefore conclude teacher's contention cannot stand.

### B. *Bekiaris finding*

The commission below found that although teacher had been active in union affairs for a number of years and had edited a newspaper and written articles and editorials critical of the District and some of its policies and had assisted HEW attorneys in an investigation of the District, "the reasons for the filing of dismissal charges against Mr. Powers were the causes stated in the statement of charges and not official dissatisfaction with his exercise of his constitutional rights." The commission specifically found that teacher's contention that his dismissal was sought by virtue of his exercise of constitutional rights "is without merit."

Teacher argued below that District could not dismiss him because it was doing so in retaliation for the exercise of his constitutional rights. Teacher stated, "Clearly, the gravamen of the charges against real party concern the writing program. Under these circumstances, to dismiss real party *for the reasons stated* by petitioner would be to dismiss petitioner in violation of his constitutional rights and with a chilling effect on the exercise of constitutional rights of other writing teachers." Teacher also asserted that his right to academic freedom and his students' concurrent right to freedom of speech and thought must be protected by the court.

In its initial memorandum of intended decision, the trial court found that the commission findings as described above were insufficient to comport with the mandates of *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575. Noting that the only bases for the commission's decision to dismiss teacher were four incidents of absence from class and his method of teaching creative writing, the trial court stressed that the four absences from class clear-

ly would not substantiate a dismissal. Under *Bekiaris, supra,* the court found that findings must be made on the issue whether any limitation on constitutional rights is justified by a compelling public interest. The court found that "Such findings were not made in this case."

District moved to reconsider the court's decision. District contended that the commission made a sufficient finding under the *Bekiaris* case. However, as noted above, the court deleted any reference to the *Bekiaris* issue in its findings and conclusions.

■ In *Bekiaris,* the Supreme Court specifically held that if the board finds the reason for dismissal *was* the cause as stated in the accusation and was not official dissatisfaction with the teacher's exercise of constitutional rights, it should enter a finding to that effect. *(Id.,* at p. 593.) That is precisely what the commission did in the instant case. Here, the commission specifically found that the reasons for filing the charges of dismissal against teacher *were* the causes as stated in the statement of charges and *not* official dissatisfaction with his exercise of his constitutional rights. This statement entirely comports with the requirement set forth in *Bekiaris, supra,* 6 Cal.3d 575.

Teacher's contention that the commission was required to make a finding on "compelling public interest" has no merit. Under *Bekiaris,* this is required only if the board finds the reason for dismissal *was not* the cause as stated in the accusation, but rather, official dissatisfaction with the teacher's exercise of constitutional rights. Then the board should order reinstatement unless it further determines that the consequent limitation on these rights is justified by a compelling state interest. *(Id.,* at pp. 592-593.)

Furthermore, unlike the teacher in *Bekiaris,* teacher here *was* able to introduce evidence in support of his contention that his dismissal was based on dissatisfaction with the exercise of his constitutional rights. Indeed, the commission summarized this evidence in its finding on the *Bekiaris* issue and disagreed with teacher's conclusion.

C. *Jurisdiction to stay the dismissal*

■ Finally, at the trial court below, District argued that the penalty of suspension is not a permitted final order after hearing to dismiss a school teacher. The rules regarding the conduct of a hearing to dismiss a teacher are found in section 44944 (formerly § 13413, enacted as part of the "Stull Act" in 1971). During the time of the hearing and decision in the instant case, section 44944, subdivision (c), stated in pertinent part as follows: "The decision of the Commission on Professional Competence shall be

made by a majority vote and the commission shall prepare a written decision containing findings of fact, determinations of issues and a disposition either:

"(1) That the employee should be dismissed.

"(2) That the employee should not be dismissed."

Pertinent to our decision here is the fact that when the Stull Act was originally introduced in January of 1971 the provision in question provided four alternative dispositions for the hearing officer: (1) the employee could be dismissed; (2) the employee could not be dismissed; (3) the employee could have his permanent status revoked for a period not to exceed two years; and (4) the employee could not have his permanent status revoked. (See Assem. Bill No. 293 introduced by Assemblyman Stull Jan. 28, 1971.)

It is significant that the latter two alternatives were specifically deleted by amendment on April 22, 1971. Thus, at one time Assembly Bill No. 293 provided for an alternative disposition less than outright dismissal, i.e., revoking a teacher's permanent status for a given period, and the Legislature specifically chose to limit the alternatives to dismissal or no dismissal.

In August 1977, the Fourth District Court of Appeal decided *Governing Board* v. *Commission on Professional Competence (Pickering)* (1977) 72 Cal.App.3d 447 [140 Cal.Rptr. 206]. Despite the seemingly clear statutory command ("a disposition either" of dismissal or nondismissal), the *Pickering* court held that the commission had the discretion to suspend an employee under the statute. The court held that former section 13413 provided that the decision be made in accordance with specified chapters of the Administrative Procedure Act, which included Government Code section 11519, and that the commission had "all the power granted to an agency therein." Thus, the court held that the commission was not restricted to determining whether the teachers should or should not be dismissed, but had the same flexibility in framing its dismissal orders as was accorded other agencies subject to the Administrative Procedure Act, including the power to stay a disciplinary order subject to probationary terms and conditions. (*Pickering, supra,* at p. 458.)

In 1978, in response to the *Pickering* decision,[4] the Legislature amended section 44944, subdivision (c).[5] The language of this section was changed to read as follows: "The decision of the Commission on Professional Competence shall be made by a majority vote and the commission shall prepare

[4]We note that a petition for hearing before the Supreme Court was never filed.
[5]Assembly Bill No. 2401 enacted September 2, 1978, taking effect January 1, 1979.

a written decision containing findings of fact, determinations of issues and the disposition *which shall be solely,* either:

"(1) That the employee should be dismissed.

"(2) That the employee should not be dismissed.

*"The commission shall not have the power to dispose of the charge of dismissal by imposing probation, suspension of a dismissal or a nondismissal, or other alternative sanctions."* (Italics added.)[6]

District contends that the amendment was intended to *clarify* rather than to change the substance of section 44944, subdivision (c). Indeed, the Legislative Digest to Statutes 1978, chapter 1172 (Assem. Bill No. 2401), states as follows: "This bill would *clarify* that the commission is limited in its disposition of the case to dismissing the employee or not dismissing the employee, with no option of other alternative sanctions." (Italics added.) Thus, District argues that the amended statute may be looked at to construe the prior one because the amendment merely "clarified" an existing statute, citing *Fahey* v. *City Council* (1962) 208 Cal.App.2d 667, 675-676 [25 Cal.Rptr. 314]. District states that "Under the rule from the *Fahey* opinion the correct interpretation of section 44944(c) is that the rule has always been that the Commission may only decide to dismiss or not to dismiss." Accordingly, District argues that since the amendment states the rule as it always has been, the decision in *Pickering* should not be the basis for upholding the decision to suspend rather than dismiss Powers.

The trial court below adopted this rationale in its original memorandum of intended decision. Because the decision was ultimately decided on purely jurisdictional grounds, findings on this issue were not made.

Teacher contends that *Pickering, supra,* 72 Cal.App.3d 447 was good law at the time the commission stayed his dismissal; therefore, the commission acted entirely properly in the instant case. We disagree for the following reasons.

We believe the court in *Pickering* erred in its analysis of the legislative intent regarding the powers of the Commission on Professional Competence. The error arose out of a failure of the court to understand the interplay between the Education Code and the Government Code. When the *Pickering* court concluded that " 'if the Legislature, in its enactment of

---

[6]We note that section 44944, subdivision (c), was again amended in 1979, 1980 and 1983. However, these amendments are not pertinent to this appeal.

[section 44944] had intended to preempt the operation of [Government Code section 11519] it would have done so explicitly,'" (72 Cal.App.3d at p. 458) it incorrectly transposed the actual chronology of the legislative action.

Prior to 1976, Government Code section 11519, subdivision (b), read in pertinent part: *"Where an agency has the power to make a probationary or conditional order* the stay of execution provided herein may be accompanied by an express condition that respondent comply with specified terms of probation . . . ."* (Italics added.) In 1976, prior to the *Pickering* decision but five years after the enactment of section 44944, Government Code section 11519, subdivision (b), was amended. The amendment deleted the above cited limiting clause. The *Pickering* court concluded that the deletion of the limiting clause cleared the way for all administrative agencies to issue stay orders. (*Pickering, supra,* 72 Cal.App.3d at pp. 456-458.) However, we point out that since section 44944 dates from 1971, it would have been impossible for the Legislature in 1971 to anticipate and forestall the application to teacher dismissals of an amendment to the Government Code that would not be enacted for some five years. Additionally, as noted above, specific provisions providing for "interim sanctions" were specifically removed from the original Stull Act in 1971.

Thus, clarification of section 44944, subdivision (c), in 1978 was necessary to reiterate what the rule had been from its inception. The amendment is merely "a restatement of the prior law in a clearer form." (*Fahey* v. *City Council, supra,* 208 Cal.App.2d 667, 675-676.) Moreover, a general statute such as the Administrative Procedure Act must yield to a specific statute. (See *Stewart* v. *San Mateo Junior College Dist.* (1974) 37 Cal.App.3d 345, 347-348 [112 Cal.Rptr. 272].) Section 44944 is a specific legislative command.

The judgment is reversed and the case is remanded to the trial court to make the appropriate findings utilizing the independent-judgment test and to determine on the merits whether the evidence warrants the teacher's dismissal.

Hanson (P. D.), J., and Martin, J., concurred.

Petitions for a rehearing were denied July 6 and 31, 1984, and the opinion and judgment were modified to read as printed above. The petition of plaintiff and appellant for a hearing by the Supreme Court was denied October 18, 1984.